566 F.2d 665
 11 ERC 1161, 8 Envtl. L. Rep. 20,140
 Edmund G. BROWN et al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
PEOPLE OF the STATE OF CALIFORNIA ex rel. Evelle J. YOUNGER,
Attorney General, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 Nos. 73-3306, 73-3305, 73-3307 and 77-2558.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 23, 1977.
 
 Joel S. Moskowitz (argued), Sacramento, Cal., M. Weinberger, San Francisco, Cal., for petitioners.
 Neil T. Proto (argued), Washington D. C., Michael Graves (argued), San Francisco, Cal., for respondent.
 On petition to Review Actions of the Administrator of the Environmental Protection Agency.
 Before WRIGHT, KILKENNY and SNEED, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 This case in a somewhat more expanded form has been before this court previously. See Brown v. Environmental Protection Agency, 521 F.2d 827 (9th Cir. 1975), vacated 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166, (Brown I ). There we held that neither section 113(a)(1) nor section 113(a)(2) of the then existing version of the Clean Air Act, 42 U.S.C.A. § 1857c-8(a)(1) and (2), 1977 Cum.Ann. Pocket Part, authorized the Administrator to impose sanctions against the State of California and its officials, including Governor Brown, for failing to comply with the directions contained in certain regulations designed to reduce air pollution by automobiles and other types of vehicles which use California's streets and highways. These regulations are listed at 521 F.2d 827, 831. Our holding rested on our interpretation of the Clean Air Act and was influenced heavily by the serious constitutional issues which we believed a contrary interpretation necessarily would encounter. Except as modified herein, we continue to regard, or once more adopt if necessary, our opinion in Brown I as the law of this Circuit.
 
 
 2
 The Solicitor General's petition for certiorari challenged our holding only with respect to the regulation requiring state inspection and maintenance programs. 40 C.F.R. § 52.242 (Revised as of July 1, 1976). His petition was granted by the Supreme Court more or less contemporaneously with its grant of petitions with respect to cases from the Fourth and the District of Columbia Circuits involving substantially similar inspection and maintenance regulations as well as certain regulations held proper and valid by the District of Columbia Circuit. See EPA v. Brown, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977); District of Columbia v. Train, EPA, 172 U.S.App.D.C. 311, 521 F.2d 971 (1975), vacated 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166; Maryland v. EPA, 530 F.2d 215 (4th Cir. 1975), vacated 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166.
 
 
 3
 The relatively narrow scope of the Solicitor General's challenge was further narrowed when prior to argument before the Supreme Court he informed the Court that certain bus purchase regulations involved in the District of Columbia Circuit decision were to be repealed and thus should not be treated as before the Court. Even this remaining small target was removed when it was conceded by the Government that the inspection and maintenance regulations to be valid should be amended to delete "all requirements that the State submit legally adopted regulations," 431 U.S. at 103, 97 S.Ct. at 1637. The Supreme Court, not wishing to render an advisory opinion with respect to regulations not then in existence, vacated the judgments of the respective Courts of Appeal and remanded the cases "for consideration of mootness and such other proceedings as may be consistent with this opinion." 431 U.S. at 104, 97 S.Ct. at 1637.
 
 
 4
 The Administrator of the Environmental Protection Agency promulgated on June 8, 1977 a revised regulation pertaining to the inspection and maintenance program California was required to establish. The revised regulation is set forth in the margin in a manner in which the portions deleted by revision appear within brackets.[1] On July 19, 1977, this court, pursuant to the Supreme Court's remand, set a date for a hearing to address two issues:
 
 
 5
 (1) Whether this case in whole or in part, is either now moot or presently not ripe for decision;
 
 
 6
 (2) Assuming this case, in whole or in part, is neither not moot nor unripe for decision, why such ripe and not moot issues should not be decided in accordance with the reasoning employed in our opinion in Brown v. EPA, 521 F.2d 827 (9th Cir. 1975).
 
 
 7
 A few days prior to the above order, July 13, 1977, the State of California filed in this court a petition for review of agency action, which we numbered No. 77-2558, and in which the State asked that we declare invalid the inspection and maintenance regulations as revised on June 8, 1977. This petition was consolidated with cases which the Supreme Court remanded to us.
 
 
 8
 The final event of juridical significance which occurred prior to our hearing of these cases and their submission for decision was the enactment by Congress on August 7, 1977 of the Clean Air Amendments of 1977.
 
 
 9
 We hold that the cases before us are not entirely moot, that each of them is at least partially ripe for decision, and that our decision should be substantially on the same, but not identical, basis as was our opinion in Brown I.
 
 I.
 
 10
 Mootness and Ripeness As To Revised Inspection and
 
 
 11
 Maintenance Regulations.
 
 
 12
 The mere recital of the rather quick moving events which affect these cases reveals that there exists a duly promulgated inspection and maintenance regulation applicable to California. This regulation requires the State (1) to "establish an inspection and maintenance program", (2) to "inspect all light duty motor vehicles" at certain intervals, (3) to "apply inspection failure criteria" of a prescribed sort, (4) to "ensure" that vehicles which fail inspection "receive the maintenance necessary" to pass inspection, (5) to begin the first inspection cycle on October 1, 1975, completing it by September 30, 1976, (6) to "designate an agency or agencies responsible" for carrying out the program, (7) to refuse to register vehicles which do not pass inspection, and (8) to submit no later than February 1, 1974 a detailed compliance schedule showing the steps it will take to establish "the inspection and maintenance program."
 
 
 13
 California at present insists, as it did previously in Brown I, with respect to the inspection and maintenance regulation which then existed, that this regulation exceeds the EPA's statutory authority and that if such authority is provided by the Clean Air Act as amended, it is void because in excess of the power of Congress acting under the Commerce Power. California takes this position although it acknowledges that under the revised regulation it is no longer required to submit to the EPA an advance text of laws and regulations implementing the required inspection and maintenance program. In brief, California contends that the Administrator's June 8, 1977 amendments achieved no more than a cosmetic change of the regulation previously before the Supreme Court, that it currently refuses to comply with the amended regulation and, as a consequence, is now in default unless we find the amended regulation invalid. Thus, as California sees it, there exists a "live" issue in which both parties have a "cognizable interest in the outcome." See Powell v. McCormack, 395 U.S. 486, 496-97, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1968). California contends that the case is neither moot nor unripe insofar as it pertains to the revised inspection and maintenance regulation.
 
 
 14
 EPA does not challenge this conclusion. It points out that its amended regulation has "removed any requirement that the State adopt regulations and any reference to state legislative activity," Memorandum For The Environmental Protection Agency, Nos. 73-3306, 73-3305, 73-3307, and that there remain other regulations invalidated by Brown I, some of which contained references to state legislative activity and the necessity for the state regulations and some of which did not, that were "rehabilitated" by the Supreme Court's vacation of our judgment in Brown I. The asserted validity of at least those regulations which avoid mentioning legislative activity and the necessity to promulgate regulations provides, according to the EPA, a ripe and not moot controversy.
 
 
 15
 Although the history of Brown I indicates that assertions by the EPA of its intention to adhere steadfastly to a specific position should be viewed with mild skepticism, we must accept its current assertions, at least for the purposes of determining mootness and ripeness of the controversy involving the revised inspection and maintenance regulations. Therefore, it is clear that the State of California and the EPA have taken directly opposing views with respect to the validity of the inspection and maintenance regulations as amended on June 8, 1977. It follows that the cases before us to the extent they concern these regulations are not moot and are ripe for decision.
 
 II.
 
 16
 Disposition of the Controversy Pertaining to the Revised
 
 
 17
 Inspection and Maintenance Regulation.
 
 
 18
 EPA's deletion of all references to state legislative activity and the necessity to adopt regulations clearly could not have been for the purpose of establishing that the revised regulations do not impose upon the State of California substantial duties. The recital of commands previously set forth unequivocally demonstrates that to comply the State would be compelled to undertake significant duties which in the nature of government would require the promulgation by the State of juridically effective orders in one form or another. While it is true that the revised regulation leaves to the State a wide range of choice in selecting the means by which it will discharge its duties, even the EPA acknowledges, as it must, that the revised inspection and maintenance regulation "imposes an affirmative duty on the State of California." Memorandum For The Environmental Protection Agency, p. 15.
 
 
 19
 The true purpose of the EPA's deletion, as we see it, was to draw attention to the fact that it no longer contends, as in Brown I we believed it did, that sections 113(a)(1) and (a)(2), 42 U.S.C. § 1857c-8(a)(1) and (a)(2), empower it to impose sanctions on the State, or its appropriate officials, should it or they fail to enforce a state implementation plan against polluters.[2] Its present contention is that the State "because it owns roads and highways and is therefore itself a polluter, can, pursuant to Section 113, be required to comply with measures designed to reduce the pollution generated on those roads and highways, especially the inspection and maintenance of automobiles." Memorandum For The Environmental Protection Agency, p. 13. In this manner the EPA presently seeks to treat the State as a polluter and bring its regulation within the scope of the authority of the Clean Air Act which, as we put it in Brown I, "permits sanctions against a state that pollutes the air, but not against a state that chooses not to govern polluters as the Administrator directs." 521 F.2d at 832. The requirement to institute an inspection and maintenance program, asserts the EPA, in essence does not differ from a requirement that a state power plant adopt prescribed pollution control devices. Each requirement is directed against the State as a polluter not as a sovereign exercising police power.
 
 
 20
 In Brown I we refused to read the Clean Air Act as authorizing the EPA to treat the State's failure to adopt an inspection and maintenance program as pollution per se. We continue to adhere to this view. Our principal reason for doing so then was our inability to discern a clear intention on the part of Congress to adopt such an attenuated notion of pollution and our belief that the EPA was in fact insisting that a state's governance of commerce under its police power was itself commerce subject to regulation by Congress acting under the Commerce Power, a view which to us raised momentous constitutional questions. While the EPA in this proceeding eschews what we believed in Brown I was the burden of its constitutional argument, we remain convinced that Congress has not enacted EPA's view of what constitutes pollution by a state.
 
 
 21
 An early manifestation of the EPA's view that the failure of the State of California to adopt an inspection and maintenance program constitutes pollution by the State may be found in 40 C.F.R. § 52.22(b)(1)(i) where an "indirect source" of pollution was defined to include "a facility, building, structure, or installation which attracts or may attract mobile source activity that results in emissions of a pollutant for which there is a national standard." Such indirect sources included, among others, highways and roads. Inasmuch as highways and roads "attract" automobiles which pollute, a state which owns such highways and roads indirectly pollutes when it fails to obey a directive of the EPA to adopt an inspection and maintenance program.
 
 
 22
 Had Congress embraced this view we would proceed immediately to consider the constitutionality of such legislation in the light of our opinion in Brown I. Congress, however, has not enacted such legislation. Prior to the Clean Air Amendments of 1977 the Act made no mention of "indirect sources" of pollution. Moreover, in the face of Congressional hostility to that portion of 40 C.F.R. § 52.22(b) covering parking-related facilities,[3] the EPA suspended that portion of its regulations, 40 F.Reg. 28064-65 (July 1975), but asserted that "different considerations govern the agency's position with respect to highways and airports." Id. at 28065. Shortly thereafter this suspension was made indefinite, 40 F.Reg. 29713-714, and, for certain purposes, has been regarded by the EPA as a revocation. See State of Arizona, et al. v. Environmental Protection Agency, 521 F.2d 825 (9th Cir. 1975), vacated 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166. In the face of this abortive attempt by the EPA to regulate parking facilities as "indirect sources" and the silence of the Act, at that time, we concluded in Brown I that merely building, owning, and managing roads and highways did not make the State the source of automobile emissions and thus a polluter within the meaning of the Act. Cf. 521 F.2d at 838.
 
 
 23
 The reluctance of the EPA to surrender its "indirect source" rationale as it relates to highways and airports and its continuing dissatisfaction with the analysis of Brown I suggest that it would turn to Congress for an amendment which would clarify the Act in a manner that would put all relevant statutory issues at rest. This it did and in H.R. 6161, passed by the House on May 26, 1977, there appeared a section 208 which required a state either "to adopt and implement a vehicle inspection and maintenance program" or to "devise and implement some other measure which would be adequate to attain and maintain the national primary ambient air quality standards by the statutory attainment dates." H.Rep.No.294, 95th Cong., 1st Sess., 288 (1977). U.S.Code Cong. & Admin.News 1977, p. 1367. Section 208 did not require a state to adopt a particular form of vehicle inspection and maintenance and, although it envisioned that a state would operate and enforce the inspection and maintenance program, it recognized explicitly that Federal implementation and enforcement was appropriate when a state refused to cooperate. Moreover, cooperation by the states was to be obtained by offering or withholding grants under other sections of H.R. 6161 and by delegating authority to operate such programs to general purpose local governments. Finally, and of prime importance to this proceeding, section 208 envisioned injunctive relief under section 113 of the Act to obtain compliance by a state as a possible tool available to the EPA.[4] This section would have forced us to confront the constitutional issues which we avoided in Brown I.
 
 
 24
 The section, however, never existed in S. 252, the Senate-passed version of the 1977 Amendments, and was not enacted in P.L. 95-95, the Clean Air Act Amendments of 1977. We construe this as an unwillingness on the part of Congress to overturn our refusal in Brown I to adopt EPA's "indirect source" theory in construing the relevant provisions of the Clean Air Act. The EPA attempts to refute this construction by pointing out that Congress in the 1977 Amendments made no attempt "to circumscribe the Administrator's understanding of his authority under section 110(c)." Memorandum For The Environmental Protection Agency, p. 6, and by referring to remarks by Senator Muskie, the Senate Floor manager for the 1977 Amendments and principal author of the original 1970 Act, in which the Administrator's understanding of his authority was endorsed. 123 Cong.Rec. § 9168 (daily ed., June 8, 1977). We are unpersuaded. What Congress in this instance did not do in 1977 is more compelling than what the Administrator and Senator Muskie believe was done in 1970. Moreover, as in Brown I, we remain reluctant to interpret the Act in a manner that compels the consideration of constitutional issues.
 
 
 25
 Our reading of the 1977 Amendments, as they relate to "indirect source review programs," also strengthens our interpretation. Section 108(a) of the Amendments grants to the Administrator limited authority to promulgate regulations respecting "indirect source review programs." Such programs are applicable only "to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated sources." An "indirect source review program" embraces only a facility-by-facility preconstruction or premodification review of "indirect sources" of air pollution. "Indirect sources" means a facility, including a road or highway, which attracts mobile sources of pollution. This limited recognition of the "indirect source" concept, a concept not previously appearing in the language of the Clean Air Act, provides no basis for interpreting the general language of sections 110(a)(2)(B) and 110(c), 42 U.S.C. §§ 1857c-5(a)(2)(B) and (c), to embrace the expansive indirect source concept urged upon us in this proceeding. The maxim, expressio unius est exclusio alterius, is not without force. It is also worth observing that section 108(e) of the Amendments provides that "transportation control" measures, within the meaning of section 110(a)(2)(B), do not include a measure which is an "indirect source review program."[5]
 
 
 26
 Thus, we remain convinced that the Clean Air Act, as amended in 1977, does not authorize the EPA to treat the State of California as a polluter subject to section 113 sanctions because of its refusal to adopt the inspection and maintenance promulgated by the Administrator on June 8, 1977.
 
 III.
 
 27
 Constitutional Concerns.
 
 
 28
 While we do not pass on the constitutional issues which would have arisen had section 208 of the House version of the 1977 Amendments, or its equivalent, been adopted, we do wish to acknowledge that the indirect source concept by which the EPA seeks to characterize the State as a polluter is a more restrained constitutional position than we believed the EPA to be advancing in Brown I. Pollution, the EPA insists, is not an act of governance but one which affects commerce and thus within reach of federal regulation under the Commerce Power. Its regulation, the EPA continues, does not operate "to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions . . ." National League of Cities v. Usery, 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976).
 
 
 29
 The State of California takes the opposite view. It is not a polluter because it builds and maintains highways and roads any more than it is a polluter merely because it issues a building permit to a private party for a smelter which pollutes after its construction. It is not the "indirect source" of all that it does not proscribe. To treat it as such a source is to efface the distinction between governance and commerce and to exceed the limits of the Commerce Power as established by National League of Cities v. Usery, supra.
 
 
 30
 Despite the restraint with which the EPA has fashioned its constitutional position, its contentions continue to raise serious questions which justify our prudent reading of the Clean Air Act as amended. National League of Cities did nothing to suggest that these concerns are insignificant. We are not prepared to dismiss lightly the contention that the EPA's indirect source argument as applied here collides with the constitutional restraints recognized by National League of Cities.
 
 
 31
 It is also perhaps worth observing that an adoption of the view that the Commerce Power is plenary and limited only by the political process, in which the states must look to their representatives in Congress for protection, when needed, from federal encroachment, National League of Cities v. Usery, 426 U.S. at 856-880, 96 S.Ct. 2465 (Mr. Justice Brennan's dissent), also would seem to require fairly strict interpretation of legislation in which federal and state interests are in conflict. Put differently, under the view of the dissenters in National League of Cities the judiciary should be reluctant to declare the federal government a winner in these contests between state and federal authorities in which the record reflects, at best, a draw.[6]
 
 
 32
 Only one additional comment regarding the constitutional issues which we have avoided is necessary. The Supreme Court in its opinion in which the judgment in Brown I was vacated pointed out that the Court of Appeals for the District of Columbia Circuit had held that it was constitutionally proper for Congress to require a state to deny "registration to a vehicle whose owner is unable to produce a federal certificate of compliance, should a federal inspection program be instituted." (Italics added). 431 U.S. at 103, 97 S.Ct. at 1637. We read the revised inspection and maintenance regulation before us as requiring the imposition of a state inspection system and the denial of registration of a vehicle whose owner cannot produce a state certificate of compliance. We recognize that the requirement validated by the District of Columbia Circuit may well fall within a long recognized power of Congress. In Brown I we said:
 
 
 33
 "We merely hold that under the Act a state may decline, without becoming liable for sanctions, to undertake a program of control suggested by the Administrator; a state, however, may not interfere with such regulation of the sources of pollution as the Administrator pursuant to the Act undertakes."
 
 
 34
 521 F.2d at 840.
 
 
 35
 To require the denial of registration by the state of a vehicle which has failed to pass federal inspection quite plausibly resembles legitimate steps by the federal government to prevent state interference with its regulation of pollution. It merely requires the state to proceed in a certain manner if it is to regulate this aspect of commerce at all. It does not appear to preclude the state's complete withdrawal from vehicle registration.
 
 
 36
 However, we need not address these issues. We only wish to make plain our recognition of the possible distinction between the constitutional concerns we have expressed, both in Brown I and here, and those which a program such as the District of Columbia Circuit envisioned would present.
 
 IV.
 
 37
 Mootness and Ripeness As To Other Regulations Invalidated by Brown I.
 
 
 38
 As already mentioned, Brown I invalidated a number of regulations, which are set forth at 521 F.2d at 831, and our judgment was vacated in its entirety by the Supreme Court. This proceeding has focused exclusively on the revised inspection and maintenance regulations. For this reason we believe it inappropriate to consider as ripe for decision all other regulations which we previously invalidated. This determination is strengthened by the fact that the EPA's efforts to enforce these regulations have been limited and inconsistent. We are certain that a vigorous effort on the part of EPA to enforce all or part of them will engender a dispute which then will be ripe for decision.
 
 
 39
 The only exception to our limiting this decision to the revised inspection and maintenance regulations is that our disposition necessarily conflicts with the general language of 40 C.F.R. § 52.23 (violations and enforcement) to the extent that regulation authorizes the imposition of sanctions against the State of California for failure to abide by the revised inspection and maintenance regulation. To that extent we here find 40 C.F.R. § 52.23 not authorized by the Clean Air Act.
 
 
 40
 Petitions For Review granted in part.
 
 
 
 [1]
 42 F.Reg. 30504, 30506 (June 15, 1977)
 "2. In § 52.242, by amending paragraphs (c) through (f) as indicated:
 § 52.242. Inspection and maintenance program.
 (c) The State of California shall establish an inspection and maintenance program applicable to all light-duty vehicles registered in the Regions that operate on streets or highways over which it has ownership or control. (No later than June 1, 1974, the State shall submit legally adopted regulations to EPA establishing such a program.) The State may exempt any class or category of vehicles which it finds are rarely used on public streets and highways (such as classic or antique vehicles). (The regulations shall include) Under the program, the State shall:
 (1) (Provisions for inspection of) Inspect all light-duty motor vehicles at periodic intervals no more than one year apart (by means of a loaded test).
 (2) (Provisions for) Apply inspection failure criteria consistent with the emission reductions claimed in the plan for the strategy. These emission reductions are 15 percent for hydrocarbons and 12 percent for carbon monoxide. (These criteria are estimated to include failure of 50 percent of the vehicles in the first inspection cycle).
 (3) (Provisions to ensure) Ensure that failed vehicles receive (within two weeks,) the maintenance necessary to achieve compliance with the inspection standards(. This shall include sanctions against non-complying individual owners and repair facilities), and retest (of) failed vehicles following maintenance(, a certification program to ensure that repair facilities performing the required maintenance have the necessary equipment, parts, and knowledgeable operators to perform the tasks satisfactorily, and such other measures as may be necessary or appropriate).
 (4) (A program of enforcement to ensure that, following inspection of maintenance, vehicles are not intentionally readjusted or modified in such a way as would cause them no longer to comply with the inspection standards. This might include spot checks of idle adjustments and/or a suitable type of physical tagging. This program shall include appropriate penalties for violation.) (Reserved)
 (5) (Provisions for beginning) Begin the first inspection cycle on October 1, 1975, (and) completing it by September 30, 1976.
 (6) (Designation of) Designate an agency or agencies responsible for conducting (, overseeing, and enforcing) the inspection and maintenance program.
 (d) After September 30, 1976, the State shall not register or allow to operate on its streets or highways any light-duty vehicle that does not comply with the applicable (standards and procedures adopted pursuant to) requirements of the program established under paragraph (c) of this section. This shall not apply to the initial registration of a new motor vehicle.
 (e) After September 30, 1976, no owner of a light-duty vehicle shall operate or allow the operation of such vehicle that does not comply with the applicable (standards and procedures adopted pursuant to) requirements of the program established under paragraph (c) of this section. This shall not apply to the initial registration of a new vehicle.
 (f) The State of California shall submit no later than February 1, 1974, a detailed compliance schedule showing the steps it will take to establish (and enforce) an inspection and maintenance program pursuant to paragraph (c) of this section (, including the text of needed statutory proposals and needed regulations that it will propose for adoption. The compliance schedule shall also include:
 ((1) The date by which the State will recommend any needed legislation to the State legislature.
 ((2) The date by which necessary equipment will be ordered.
 ((3) A signed statement from the Governor and State Treasurer identifying the sources and amount of funds for the program. If funds cannot legally be obligated under existing statutory authority, the text of needed legislation shall be submitted)."
 
 
 [2]
 The abandonment by the EPA of the contention we believed it was making in Brown I is apparent in the following paragraph appearing in the Memorandum filed by the EPA in this proceeding
 "In Brown, however, this Court devoted considerable attention to section 113; in particular, subsection (a)(2). Brown v. EPA, supra, 521 F.2d at 833-837. This Court found that both subsections (a)(1) and (a)(2) were merely designed 'to vest the Administrator with power to enforce a state implementation plan should the state fail to do so' (id. at 835), and not 'to equip the Administrator with power to sanction the nonenforcing state' (id. at 834). Although the Court was correct in each of those observations, it failed to recognize the important difference between these subsections." (Italics added) Memorandum For The Environmental Protection Agency, p. 12.
 
 
 [3]
 Section 510, Agriculture-Environmental Consumer Protection Appropriations Act, 1975, barred the use of EPA funds to limit or regulate facilities
 
 
 [4]
 H.Rep.No.294, 95th Cong., 1st Sess., 288 (1977) provides as follows: U.S.Code Cong. & Admin.News 1977 p. 1369
 This section envisions that the States will undertake to adopt and enforce the inspection and maintenance program. In the event a State to which this section applies fails or refuses to adopt such an I/M system in its plan, then the Administrator would be required to promulgate such a program for the appropriate region(s) in that State under section 110(c) of the Act.
 Once the I/M program has become part of an "applicable implementation plan" (whether by State adoption and EPA approval or by promulgation of the Administrator), then enforcement and implementation can occur in several possible ways. Most preferably, the State may agree voluntarily to implement and enforce the I/M program. Other options include (1) inducing the State to do so, by offering grants under section 210 of the Act or by withholding part of a State program grant under section 105 of the Act or by such other means as have been held permissible by the Court in District of Columbia v. Train ; (2) delegating authority to general purpose local governments to implement and enforce the program under section 303 of the bill; (3) if feasible, providing for Federal implementation and enforcement of the program (including Federal licensing of private I/M centers, or turnkey operations, and imposing Federal inspection fees); or (4) seeking injunctive relief under section 113 of the Act; or (5) a combination of the above. It should be noted that the various mechanisms for obtaining voluntary compliance (e. g., withholding of program grants) are intended to provide alternatives to enforcement actions under section 113, thus allowing the Administrator to avoid compulsion where implementation of the necessary actions can be assured by other means.
 
 
 [5]
 Section 108(e) of the Clean Air Act Amendment of 1977 is as follows:
 "(e) Section 110(a) of such Act is amended by adding at the end thereof the following new paragraphs:
 (5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.
 (ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.
 (iii) Any State may revise an applicable implementation plan approved under section 110(a) to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.
 (B) The Administrator shall have the authority to promulgate, implement and enforce regulations under section 110(c) respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.
 (C) For purposes of this paragraph, the term 'indirect source' means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of section 110(c) (2)(D)(ii), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.
 (D) For purposes of this paragraph the term 'indirect source review program' means the facility-by-facility preconstruction or premodification review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations
 (i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or
 (ii) preventing maintenance of any such standard after such date.
 (E) For purposes of this paragraph and paragraph (2)(B), the term 'transportation control measure' does not include any measure which is an 'indirect source review program'.
 (6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 113(d) or section 119 (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system."
 
 
 [6]
 Recent scholarly comment has recognized, under a regime in which the courts abstain from deciding constitutional issues about federalism, the importance of the courts' sensitivity to those issues in their interpretation of statutes. Choper, The Scope of Judicial Power Vis-a-Vis the States, 86 Yale L.J. 1552, 1602 (". . . the Court would be following its customary procedure of assuming, in the absence of clear contrary evidence, that Congress or the President either did not intend or did not consider applications of its enactments that test the limits of national power. This judicial stance would be especially appropriate if the record indicates that the political branches did not reflect on the question of constitutionality. The Court may continue to pay proper deference to the opinions of federal agencies as to the meaning of the statute or executive action before it. But the Court is not bound unless the pertinent political branch has itself unmistakably spoken." (footnote omitted)). Cf. Stewart, The Development of Administrative and Quasi-Constitutional Law in Judicial Review of Environmental Decisionmaking: Lessons from the Clean Air Act, 62 Iowa L.R. 713, 759-61 (1977); Stewart, Pyramids of Sacrifice? Problems of Federalism in Mandating State Implementation of National Environmental Policy, 86 Yale L.J. 1196, 1265, 1266-67, n. 238. See also Frankfurter, Some Reflections on the Reading of Statutes, 47 Col.L.Rev. 526, 540 ("Federal regulation of this character cannot therefore be construed without regard to the implications of our dual system of government . . . . The history of congressional legislation regulating not only interstate commerce as such but also activities intertwined with it justify the generalization that, when the Federal Government takes over such local radiations in the vast network of our national economic enterprise and thereby radically readjusts the balance of state and national authority, those charged with the duty of legislating are reasonably explicit and do not entrust its attainment to that retrospective expansion of meaning which properly deserves the stigma of judicial legislation.")