**Richard MACK, Sheriff of Graham County, Arizona, Plaintiff–Appellee–Cross–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellant–Cross–Appellee.**

**Jay PRINTZ, Sheriff/Coroner, Ravalli County, Montana, Plaintiff–Appellant–Cross–Appellee,**

v.

**UNITED STATES of America, Defendant–Appellee–Cross–Appellant.**

Nos. 94–16940, 94–17002, 94–36193 and 95–35037.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 1995.

Decided Sept. 8, 1995.

David T. Hardy, Tucson, AZ, for plaintiff-appellee-cross-appellant Mack.

Mark I. Levy, United States Department of Justice, Washington, DC, for defendant-appellant-cross-appellee United States of America.

Stephen P. Halbrook, Fairfax, VA, for plaintiff-appellant-cross-appellee Printz.

Jonathan K. Baum, Katten, Muchin & Zavis, Chicago, IL, for amicus United States Senator Paul Simon.

Richard A. Cordray, Assistant Attorney General, Columbus, OH, for amicus State of Ohio.

James H. Warner, Fairfax, VA, for amicus Law Enforcement Alliance of America.

Randolph D. Moss, Wilmer, Cutler & Pickering, Washington, DC, for amicus Handgun Control, Inc., et al.

Before: CHOY, CANBY, and FERNANDEZ, Circuit Judges.

Opinion by Judge CANBY; Partial Concurrence and Partial Dissent by Judge FERNANDEZ.

CANBY, Circuit Judge:

Sheriffs Richard Mack and Jay Printz, in separate actions, challenged the constitutionality of the Brady Handgun Violence Prevention Act, P.L. 103–159, 107 Stat. 1536 (1993), codified at 18 U.S.C. § 922(s). The main issue on appeal concerns the district courts' respective holdings that section 922(s)(2) of the Brady Act, requiring local law enforcement officials to perform background checks of handgun purchasers, violates the Tenth Amendment. We conclude that the Act is constitutional, and we accordingly reverse the judgments of the district courts.

## FACTS

The Brady Act, passed in 1993 as an amendment to the Gun Control Act of 1968, imposes a waiting period of up to five days for the purchase of a handgun, and subjects purchasers to a background check during that period.[1] *See* 18 U.S.C. § 922(s)(1). Within five years from the effective date of the Act, such checks will be performed instantaneously through a national criminal background check system maintained by the Department of Justice, 18 U.S.C. § 922(t), but in the meantime the background checks must be performed by the Chief Law Enforcement Officer (CLEO) of the prospective purchaser's place of residence. 18 U.S.C. § 922(s)(2). The Act requires CLEOs to "make a reasonable effort to ascertain ... whether receipt or possession [of a handgun by the prospective buyer] would be in violation of the law...." *Id.* The CLEO performs the check on the basis of a sworn statement signed by the buyer and provided to the CLEO by a federally-licensed gun dealer. 18 U.S.C. § 922(s)(1)(A). If the CLEO approves the transfer, he or she must destroy the buyer's statement within twenty business days after the statement was made.

---

1. The waiting period and background check prescribed by the Act are not required in States that have permit systems meeting standards prescribed by the Act. 18 U.S.C. § 922(s)(1)(C), (D).

18 U.S.C. § 922(s)(6)(B)(i). If the CLEO disapproves the transfer, the CLEO must provide the reasons for the determination within twenty business days if so requested by the disappointed purchaser. 18 U.S.C. § 922(s)(6)(C).

Richard Mack and Jay Printz, as sheriffs, are the CLEOs in their respective jurisdictions of Graham County, Arizona, and Ravalli County, Montana. They brought these actions in their local federal district courts to challenge the Brady Act's provisions imposing duties upon them. Mack and Printz both invoked the Tenth and Fifth Amendments. Mack also challenged the Act as violating the Thirteenth Amendment.

Both district courts held that section 922(s)(2) of the Act, by imposing on the sheriffs a mandatory duty to conduct background checks, violated the Tenth Amendment as interpreted by the Supreme Court in *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). *See Mack v. United States*, 856 F.Supp. 1372 (D.Ariz.1994); *Printz v. United States*, 854 F.Supp. 1503 (D.Mont.1994).[2] Neither court enjoined the provisions of the Act requiring CLEOs to explain the reasons for rejecting a purchase application, § 922(s)(6)(C), and requiring destruction of records, § 922(s)(6)(B). The *Printz* decision noted that the requirement of a statement of reasons became optional once the mandatory background check

was invalidated, and that the provision for destruction of records was "*de minimis.*"

In *Mack*, the district court also held that the criminal provisions of the Act applied to CLEOs, and were void for vagueness under the Fifth Amendment because they made it a crime for CLEOs to fail to make a "reasonable effort" to ascertain the lawfulness of a prospective handgun purchase. The *Printz* court held that the criminal provisions did not apply to CLEOs. Finally, the *Mack* court rejected Mack's Thirteenth Amendment challenge. Both district courts held that the invalid portions of the Act were severable, and accordingly refused to hold the entire Act unconstitutional.

In both actions, both sides appealed.[3] The sheriffs primarily dispute the holdings of severability, while the United States contends that the entire Act is constitutional.[4]

## ANALYSIS

### I. THE TENTH AMENDMENT CHALLENGE

■ No one in this case questions the fact that regulation of the sales of handguns lies within the broad commerce power of Congress.[5] The issue for decision is whether the manner in which Congress has chosen to regulate in the Brady Act violates the Tenth Amendment.

---

2. Four other district courts have ruled on whether the interim provisions of the Brady Act violates the Tenth Amendment. *See Romero v. United States*, 883 F.Supp. 1076 (D.La.1995) (provisions of Brady Act requiring CLEOs to perform background checks, destroy sworn statements, and provide written response to those denied a handgun, held unconstitutional); *Frank v. United States*, 860 F.Supp. 1030 (D.Vt.1994) (provision of Brady Act requiring CLEOs to perform background checks unconstitutional); *McGee v. United States*, 863 F.Supp. 321 (S.D.Miss.1994) (same); *Koog v. United States*, 852 F.Supp. 1376 (W.D.Tex.1994) (interim provisions not unconstitutional).

3. Handgun Control, Inc., et al., Senator Paul Simon, and the State of Ohio, have filed briefs as amici curiae in support of the United States. The Law Enforcement Alliance of America filed an amicus curiae brief in support of Mack.

4. The United States also argues that, if the disputed provisions are unconstitutional, the injunc-

tion should prevent enforcement only against the two sheriffs because they did not bring class actions. Our disposition of the appeal makes it unnecessary for us to address this contention.

5. Nor is any question raised by the Supreme Court's recent decision in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), holding that Congress lacked authority under the commerce clause to enact the Gun Free School Zones Act. Unlike the statute in *Lopez*, the Brady Act regulates the *sale* of handguns and thus directly regulates commerce. The Brady Act is an amendment to a comprehensive federal scheme for the regulation of firearms sales that unquestionably affect interstate commerce. The legislative history of the Brady Act also contains findings that gun violence affects commerce, and we accept those findings. *See* H.R.Rep. 103–344, 103rd Cong., 1st Sess., *reprinted in* 1993 U.S.C.C.A.N. 1984, 1985.

■ The Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or the people." U.S. Const. amend. X. As a textual matter, therefore, the Tenth Amendment "states but a truism that all is retained which has not been surrendered." *United States v. Darby*, 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941). By its terms, the Amendment does not purport to limit the commerce power or any other enumerated power of Congress.

■ In recent years, however, the Tenth Amendment has been interpreted "to encompass any implied constitutional limitation on Congress' authority to regulate state activities, whether grounded in the Tenth Amendment itself or in principles of federalism derived generally from the Constitution." *South Carolina v. Baker*, 485 U.S. 505, 511 n. 5, 108 S.Ct. 1355, 1360 n. 5, 99 L.Ed.2d 592 (1988). Thus, "the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157, 112 S.Ct. 2408, 2418, 120 L.Ed.2d 120 (1992). The question before us is whether the Brady Act, by requiring CLEOs to perform background checks on handgun purchasers, transgressed such an implied limitation on federal power. We conclude that it did not.

■ There are numbers of ways in which the federal government is permitted to secure the assistance of state authorities in achieving federal legislative goals. First and most directly, the federal government may coerce the states and their employees into complying with federal laws of general applicability. *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).[6] Second, Congress may condition the grant of federal funds on the States' taking governmental action desired by Congress. *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987).

■ These broad categories do not exhaust, however, the means by which the federal government can enlist state employees in implementing federal programs. State judicial and administrative bodies may be required to apply federal law. *Testa v. Katt*, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947); *FERC v. Mississippi*, 456 U.S. 742, 760–61, 102 S.Ct. 2126, 2137–38, 72 L.Ed.2d 532 (1982). The federal government may offer to preempt regulation in a given area, and permit the states to avoid preemption if they regulate in a manner acceptable to Congress. *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 290–91, 101 S.Ct. 2352, 2367–68, 69 L.Ed.2d 1 (1981).

The federal government has been permitted effectively to compel the states to issue registered rather than bearer bonds. *South Carolina v. Baker*, 485 U.S. 505, 514, 108 S.Ct. 1355, 1361–62, 99 L.Ed.2d 592 (1988). Finally, the federal government has been permitted to require state utility regulators to consider prescribed federal standards in determining regulatory policies. *FERC v. Mississippi*, 456 U.S. at 765, 102 S.Ct. at 2140–41. In the course of the latter ruling, the Supreme Court referred to and rejected the "19th century view" that "Congress has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it." *Id.* at 761, 102 S.Ct. at 2138 (quoting *Kentucky v. Dennison*, 24 How. 66, 107, 16 L.Ed. 717 (1861)). That view, said the Court, "is not representative of the law today." *Id.* "The federal government has some power to enlist a branch of state government ... to further federal ends." *Id.* 456 U.S. at 762, 102 S.Ct. at 2139.

■ Against this background, there would appear to be nothing unusually jarring to our system of federalism in the Brady Act's requirement that CLEOs, during a five-year interim period, "make a reasonable effort to ascertain" the lawfulness of handgun purchases. The obligation imposed on state officers by the Brady Act is no more remarkable

---

**6.** It is true that this principle was rejected for certain state functions in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), but *National League of Cities* was expressly overruled in *Garcia*, 469 U.S. at 557, 105 S.Ct. at 1020–21, and *Garcia* remains the law controlling us.

than, say, the federally-imposed duties of state officers to report missing children, 42 U.S.C. § 5779(a), or traffic fatalities, 23 U.S.C. § 402(a).

Mack and Printz, however, contend that the precedential background set forth above was changed by *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), and that the federal government is now flatly precluded from commanding state officers to assist in carrying out a federal program. We do not read *New York* that broadly.

Although we concede that there is language in *New York* that lends support to the view of Mack and Printz, that language must be interpreted in the context in which it was offered. *New York* was concerned with a federal intrusion on the States of a different kind and much greater magnitude than any involved in the Brady Act. The constitutional evil that *New York* addressed was one recognized by several of the cases already cited: the federal government was attempting to direct the States to enact their own legislation or regulations according to a federal formula.

*New York* involved the constitutional validity of the Low–Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. § 2021b *et seq.* The part of the Act that the Court found to violate the Tenth Amendment was the so-called "take title" provision. Under that provision, a State that failed to regulate radioactive waste according to congressional standards was simply given title to the waste within its borders (which previously would have been in private hands). The waste then became the total responsibility of the State as owner. The alternative to this unacceptable prospect was for the State to legislate or regulate in a manner that Congress dictated, and "a direct order to regulate, standing alone, would . . . be beyond the authority of Congress." *Id.* at 176, 112 S.Ct. at 2428. Thus, in response to the government's argument that a strong federal interest supported the "take title" provision, the Court in *New York* stated: "whether or not a particularly strong federal interest enables Congress to bring state governments within the orbit of generally applicable *federal* regulation, no Member of the Court has ever suggested that such a federal interest would enable Congress to command a state government to enact *state* regulation." *Id.* at 178, 112 S.Ct. at 2429. In the same vein was the Court's conclusion after reviewing the debates at the time of the founding of the Constitution:

> We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts. *E.g., FERC v. Mississippi* . . . . The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce. *Id.* at 166, 112 S.Ct. at 2423.

Other decisions of the Supreme Court have recognized this proposition that the federal government cannot coerce States into performing the ultimately sovereign acts of legislating or regulating in a manner specified by the federal government. In *Virginia Surface Mining,* the Court noted that the provision of an alternative of federal regulation rendered federal standards for state regulation permissible; because the State had a constitutional option, "there can be no suggestion that the Act commandeers the legislative processes by directly compelling them *to enact and enforce* a federal regulatory program." *Virginia Surface Mining,* 452 U.S. at 288, 101 S.Ct. at 2366 (emphasis added). Similarly, in *FERC v. Mississippi,* the Court noted that the federal command that the State "consider" federal alternatives was constitutional because "[t]here is nothing in PURPA 'directly compelling' the States to enact a legislative program." *FERC v. Mississippi,* 456 U.S. at 765, 102 S.Ct. at 2141.

*New York,* then, is best read as a case that draws a line already partly delineated in *Virginia Surface Mining* and *FERC v. Mississippi:* the federal government is not entitled to coerce the States into legislating or regulating according to the dictates of the federal government. Certainly *New York* did not purport to overrule *Virginia Surface*

*Mining* or *FERC v. Mississippi*, or even to disavow the latter decision's rejection of the nineteenth century view that the federal government cannot command state employees. *New York* can be read consistently with these cases as an instance where "the etiquette of federalism has been violated by a formal command from the National Government directing the State to enact a certain policy, cf. *New York*." *United States v. Lopez*, ── U.S. ──, ──, 115 S.Ct. 1624, 1642, 131 L.Ed.2d 626 (1995) (Kennedy, J., concurring); *see also Board of Natural Resources v. Brown*, 992 F.2d 937, 947 (9th Cir.1993) ("direct commands to the states to regulate according to Congress's instructions" "violate the Tenth Amendment as interpreted by *New York*").[7]

■ There are good reasons for focusing Tenth Amendment concern on federal coercion of a State's enactment of legislation or regulations or creation of an administrative program. These activities are inherently central acts of a sovereign; if an area of state activity is to be protected from direct coercion by an implication drawn from the Tenth Amendment, legislating and regulating are prime candidates. "[T]he power to make decisions and to set policy is what gives the State its sovereign nature." *FERC v. Mississippi*, 456 U.S. at 761, 102 S.Ct. at 2138. There is a second reason, also, emphasized in *New York* itself. Democratic governments must be politically accountable. When the federal government requires the States to enact legislation, the enacted legislation is *state* legislation. Thus, it will likely "be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." *New York*, 505 U.S. at 169, 112 S.Ct. at 2424. When the federal government itself imposes a requirement on a state official, the requirement is more clearly an act of the federal government and thus does not, to the same extent, undermine political accountability.[8]

■ The Brady Act is not the kind of a federal mandate condemned by *New York*, nor does it present the concerns related above. The Brady Act does not embody a mandate to the "States" in the sovereign sense discussed in *New York*, *FERC v. Mississippi*, or *Virginia Surface Mining*. The Brady Act is a regulatory program aimed at individuals and not the States. It is true that, for a limited period of time, the Act requires state law enforcement officials, the CLEOs, to make reasonable efforts to assist in carrying out the federal program. But the CLEOs are not being commanded to engage in the central sovereign processes of enacting legislation or regulations. They are not even being asked to produce a state policy, for which the state must bear political accountability. Instead, they are directed to serve for a temporary period as law enforcement functionaries in carrying out a federal program. Their activities are not alien to their usual line of work, and represent a minimal interference with state functions. In that sense, their duties are not different from other minor obligations that Congress has imposed on state officials.

Mack and Printz do not agree that the Brady Act's interference with their state duties is minimal. They point out that there are many factors that may make a prospective handgun purchase illegal under the Act. A purchase is unlawful, for example, if the purchaser is a fugitive, is an unlawful user of a controlled substance, has been adjudicated a mental defective, has been dishonorably discharged from the armed forces, has renounced his citizenship, or is under certain restraining orders involving an intimate partner. 18 U.S.C. § 922(g). They also contend that it will be unduly burdensome to give reasons for rejecting a proposed purchase,

---

7. Thus we conclude that when the Court in *New York* stated that "[t]he Federal Government may not compel States to enact or *administer* a federal regulatory program," the Court meant "administer" in the sense of being in charge of a program and making policy decisions with respect to the program. *New York*, 505 U.S. at 188, 112 S.Ct. at 2434–35.

8. We recognize that some individuals may criticize local officials for implementing federal regulations. But when federal regulations are imposed by the federal government, political accountability by the federal government for those regulations remains.

within 20 days of being requested by the disappointed purchaser. *See* § 922(s)(6)(C). Mack and Printz point out that they are sheriffs in rural counties with limited staffs and resources. To research for all of these disabilities and to give reasons for rejection, Mack and Printz argue, will either take all of their time or so much of it that they will be unable to perform their regular county duties.

The government, on the other hand, argues that there is no requirement that CLEOs pursue all of these avenues of potential disqualification. They are enjoined only to "make a reasonable effort," § 922(s)(2), and the statute's only fixed requirement is a search in whatever recordkeeping systems are available and in a national system. *Id.* A reasonable effort, the government contends, might in the circumstances of Mack and Printz simply be a check of the existing computer records.

We agree, and the government concedes, that there is likely to be some point at which a federal statute that enlists the aid of state employees can become so burdensome to the State that it violates the Tenth Amendment. Surely the federal government cannot stall the state government in its tracks by imposing all-consuming federal duties on the State's employees. We conclude, however, that the Brady Act does not approach that point. Mack and Printz have not demonstrated that the Act will interfere unduly with their duties. Indeed, to a considerable degree, the dispute over the magnitude of the burden imposed upon them is not ripe for resolution. Mack and Printz have not been subjected to any interpretation of the Act, or any attempt to enforce it against them, that requires them to do more than check computer records. On this record, we cannot conclude that "a reasonable effort" inevitably requires more than this minimum for Mack and Printz. To perform such computer checks, and to explain reasons for rejection when and if disappointed purchasers so request, has not been shown to constitute the kind of interference with state functions that would raise Tenth Amendment concerns. It follows even more strongly that the minimal requirement of destruction of records presents no constitutional problem.

■ We also find no support for the Tenth Amendment claims of Mack and Printz in the cases from our circuit that they cite. *See Board of Natural Resources v. Brown,* 992 F.2d 937 (9th Cir.1993); *United States v. Best,* 573 F.2d 1095 (9th Cir.1978); *Brown v. Environmental Protection Agency,* 521 F.2d 827 (9th Cir.1975), *vacated as moot* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977).[9] In *Board of Natural Resources* we held that the Forest Resources Conservation and Shortage Relief Act violated the Tenth Amendment. *Board of Natural Resources,* 992 F.2d at 947. That Act however—akin to the statute in *New York*—required the States to issue regulations and was far more demanding of state officials than the Brady Act. *See Board of Natural Resources,* 992 F.2d at 947. *Best* applied the *National League of Cities* governmental function test, *Best,* 573 F.2d at 1102, which has been abandoned. *See Garcia Metropolitan Transit Authority,* 469 U.S. at 531, 105 S.Ct. at 1007 (overruling *National League of Cities*). And *Brown,* like *Board of Natural Resources,* involved regulations that clearly intruded upon a state's sovereignty, unlike the contested provisions of the Brady Act. *See Brown,* 521 F.2d at 829–830 (State had to develop and implement plan for implementing, enforcing, and maintaining national air standards). Additionally, *Brown* relied upon the Tenth Amendment view espoused in *Kentucky v. Dennison,* 65 U.S. (24 How.) 66, 107, 16 L.Ed. 717 (1861), *overruled by Puerto Rico v. Branstad,* 483 U.S. 219, 107 S.Ct. 2802, 97 L.Ed.2d 187 (1987), that "the Federal Government ... has no power to impose on a State officer, as such, any duty whatsoever...." *See Brown,* 521 F.2d at 841. As the Supreme Court has made clear, the view espoused in *Kentucky v. Dennison* is no longer representative of the law.

9. Although the Supreme Court vacated *Brown,* on remand we stated: "Except as modified herein, we continue to regard, or once more adopt if necessary, our opinion in *Brown I* as the law of this circuit." *Brown v. EPA,* 566 F.2d 665, 666 (9th Cir.1977). For reasons discussed later in the text, however, the precedential value of *Brown* is limited.

*FERC*, 456 U.S. at 761, 102 S.Ct. at 2138.[10] We therefore reject Mack's and Printz's Tenth Amendment challenges to the Brady Act.[11]

## II. THE FIFTH AMENDMENT VAGUE-NESS CHALLENGE

[10] Section 924(a)(5) of the Act provides that "[w]hoever knowingly violates subsection (s)" of the Act is subject to fine or imprisonment or both. Mack and Printz contend that this provision subjects them to criminal liability for failing to "make a reasonable effort" to ascertain whether a particular purchase would violate the law, as required by section 922(s)(2). So construed, the criminal provision is unconstitutionally vague, according to Mack and Printz, because a person of reasonable intelligence has no way of knowing what may constitute a "reasonable effort."

It is not at all clear, however, that section 924(a)(5) is intended to apply to the Act's requirements imposed upon CLEOs. Indeed, the Montana district court viewed the criminal prohibition as ambiguous in that

regard, and concluded that it did not apply to CLEOs.

We decline to reach this issue, however, because it is not ripe.[12] Mack and Printz have not been charged under the Act with any criminal violations, nor are they likely to be. The United States represented during oral argument that the Justice Department's official position is that the criminal sanctions of the Brady Act do not apply to CLEOs. Because Mack and Printz do not face a "credible threat of prosecution," *San Francisco County Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 821 (9th Cir.1987), *aff'd* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), there is no "case or controversy." *See Campbell v. Wood*, 18 F.3d 662, 680 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994).[13] In the extremely unlikely event that a criminal prosecution is one day brought against a CLEO, the constitutional objection may be raised in defense at that time.

We therefore vacate the ruling of the District Court of Arizona that the criminal provisions apply to CLEOs and are void for vagueness, as well as the ruling of the Dis-

---

**10.** The Law Enforcement Alliance of America, as Amicus Curiaè, argues that the method by which the Brady Act was enacted violates the "structuralist" test articulated by *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), under which the States are protected from overreaching by the federal government primarily by "the workings of the National Government itself, rather than in discrete limitations on the objects of federal authority." *Id.* at 552, 105 S.Ct. at ——. The Court in *New York* has indicated that *Garcia* is limited to statutes that subject "a State to the same legislation applicable to private parties." *New York*, 505 U.S. at 160, 112 S.Ct. at 2420. But even if we assume that *Garcia's* structuralist test were applicable, we cannot accept the Law Enforcement Alliance's view that the Brady Act would fail the test. There is no showing that the States affected were "deprived of any right to participate in the national political process" or were "singled out in a way that left [them] politically isolated and powerless." *South Carolina v. Baker*, 485 U.S. at 513, 108 S.Ct. at 1361.

**11.** Because we hold that the Brady Act does not violate the Tenth Amendment, we do not consider whether section 922(s)(2) is severable from the remainder of the Act, or whether the district courts erred in issuing injunctions that applied statewide.

**12.** Mack and Printz also make a vagueness argument based on their exposure to civil proceedings. Neither Mack nor Printz has been subjected to civil proceedings, nor have they pointed to any civil proceeding to which they would be subject that would violate the Fifth Amendment. In any event, because this issue was not raised below, we decline to reach it.

**13.** Mack and Printz also suggest that they need not face a reasonable threat of prosecution. None of the cases that they cite support this proposition, however. *See Board of Natural Resources*, 992 F.2d at 945 (plaintiff showed injury in fact); *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (Court did not reach the justiciability issue); *Beacon Journal Pub. Co. v. Unger*, 532 F.Supp. 55, 58 (N.D.Ohio 1982) (plaintiff showed injury in fact); *Brown v. EPA*, 521 F.2d at 831 & 829 n. 1 (the EPA had already given a notice of violation.); *Gentile v. State Bar*, 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (plaintiff charged with violation); *Babbitt v. Farm Workers*, 442 U.S. 289, 299–300, 99 S.Ct. 2301, 2309–10, 60 L.Ed.2d 895 (even though plaintiffs did not face an imminent threat of prosecution, statute was "sure to work the injury alleged," and so Court found a case or controversy).

trict Court of Montana that the criminal provisions do not apply to CLEOs. These claims are to be dismissed as unripe.

## III. THE THIRTEENTH AMENDMENT CHALLENGE

▮ Mack also challenges the Brady Act as violating the Thirteenth Amendment. The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime ... shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII. According to Mack, section 922(s) requires him to perform labor for the United States or face legal sanctions, even though he is not a federal employee.

Unlike a slave, however, Mack can quit work at any time. By doing so, he escapes all compulsion. The requirements of the Brady Act are not placed on Mack personally; the duties that are imposed attend the office. Thus the Brady Act does not coerce Mack "by improper or wrongful conduct" into service by causing and intending to cause him "to believe that he ... has no alternative but to perform the labor." *Brogan v. San Mateo County,* 901 F.2d 762, 764 (9th Cir.1990) (citation omitted). The fact that Mack, if he continues to be sheriff, must perform certain duties as a condition of his employment, does not violate the Thirteenth Amendment. *Cf. United States v. 30.64 Acres of Land,* 795 F.2d 796, 800–01 (9th Cir.1986) (requiring lawyers to perform *pro bono* services does not violate Thirteenth Amendment because requirement is a condition of practicing law).

## CONCLUSION

The Brady Act violates neither the Tenth nor Thirteenth Amendment. Mack and Printz's Fifth Amendment vagueness challenge is not ripe. Accordingly, the district courts' injunctions prohibiting the United States from enforcing the disputed provisions of the Brady Act are vacated, and the district courts' judgments are reversed insofar as they invalidate portions of the Act. The

portions of the cross-appeal in *Mack* and the appeal in *Printz* that challenge the district courts' rulings of severability are dismissed as moot; in all other respects the rulings challenged by Mack and Printz, are affirmed. The cases are remanded with instructions to dismiss the vagueness challenges as unripe. The United States is entitled to its costs on appeal.

No. 94–16940 (Appeal by United States) **REVERSED.**

No. 94–17002 (Cross-appeal by Mack) **AFFIRMED** in part and **DISMISSED** in part.

No. 94–36193 (Appeal by Printz) **AFFIRMED** in part and **DISMISSED** in part.

No. 95–35037 (Cross–appeal by United States) **REVERSED.**

FERNANDEZ, Circuit Judge, concurring and dissenting.

I concur in parts II and III of the majority opinion, but I respectfully dissent from part I.[1]

This case makes palpable the notion that the states are just a part of the national government, a notion that was rejected when this country was founded. Congress has previously attempted to order the states to legislate or regulate in particular ways, and it has failed at that. *See, e.g., New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Board of Natural Resources v. Brown,* 992 F.2d 937 (9th Cir. 1993); *cf. United States v. Best,* 573 F.2d 1095, 1102–03 (9th Cir.1978). That is to say, Congress has failed when it has not given the states the option to avoid the intended yoke. *See, e.g., FERC v. Mississippi,* 456 U.S. 742, 766, 102 S.Ct. 2126, 2141, 72 L.Ed.2d 532 (1982); *see also Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Brown v. EPA,* 521 F.2d 827 (9th Cir.1975), *vacated by* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), *on remand to* 566 F.2d 665 (9th Cir.1977). Even those determinations are not without their problems because

---

1. Given the majority's decision, I see no need to discuss the criminal provisions of this law, the severability of the law's provisions, or the

breadth of the injunctions imposed by the district courts.

they could lead to a "dismemberment of state government." *See FERC*, 456 U.S. at 782, 102 S.Ct. at 2150 (O'Connor, J., dissenting).

Now Congress has avoided those issues, but it has done so by eliminating the niceties of the federal-state relationship entirely. Rather than ordering state legislatures or agencies to adopt a scheme for vetting requests for gun transfers, Congress has avoided that hindrance and dragooned the state officials directly. Under this new approach, the states have nothing to say about it. Their officials are ordered to become part of a federal gun control program at the state's own expense and are ordered to engage in various tasks necessary to administer that program. Those officials must make a "reasonable effort" to decide whether receipt of a weapon by a proposed transferee "would be in violation of the law" of the United States. 18 U.S.C. § 922(s)(2). Those efforts must include "research in whatever State and local recordkeeping systems are available *and* in a national system designated by the Attorney General." *Id.* (emphasis added). And the work must be done within five business days. *Id.* The officials must also dispose of the materials and may not make any use of them other than that directed by Congress. *Id.* § 922(s)(6)(B). They must provide written explanations for negative determinations upon request. *Id.* § 922(s)(6)(C). Presumably those officials must also adopt appropriate procedures for the carrying out of those functions. Perhaps that is not forced administration of the federal gun regulation program, but I fail to see why it is not.

Of course, the states are to bear the full cost of these tasks, and, unless the states adopt a local permit system, they cannot opt out of the federal program. If a state does not choose to engage in the regulation of this part of commerce—commerce in weapons— that makes no difference at all. In other words, state officials are conscripted by the federal government to fulfill its purposes and they can do nothing about that.

The government argues that this is much more respectful of state sovereignty than the legislation struck down in *New York*. I do not agree. If the Tenth Amendment has anything to do with the separate sovereign dignity of the states, it is difficult to see how that dignity is not undermined by the reality of a command that they commit their resources to the carrying out of this kind of federal policy, whether they like it or not.

Moreover, we are not dealing with a situation where a state seeks to stay in the business of regulating commerce in weapons. Quite the contrary. This legislation impacts states that do not wish to do so. I assume that the Supreme Court meant what it said when it said:

> States are not mere political subdivisions of the United States. State governments are neither regional offices nor administrative agencies of the Federal Government. The positions occupied by state officials appear nowhere on the Federal Government's most detailed organizational chart. The Constitution instead "leaves to the several states a residuary and inviolable sovereignty," reserved explicitly to the States by the Tenth Amendment.

> Whatever the outer limits of that sovereignty may be, one thing is clear: The Federal Government may not compel the States to enact or administer a federal regulatory program.

*New York*, 505 U.S. at 186–90, 112 S.Ct. at 2434–35 (citations omitted).

This legislation is a step toward concentrating power in the hands of the federal government, for it treats state officials and workers as if they were mere federal employees. It makes every CLEO's office an office of the federal bureaucracy, funded by the states, but directed from Washington. The time to stop this journey of a thousand miles is at the first step.[2]

Therefore, I respectfully dissent from the majority's determination that the statute does not violate the Tenth Amendment.

---

**2.** Cf. Lao-tzu, Bartlett's Familiar Quotations 65, quotation 1, (1980).