Filed:  May 9, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 95-1052

Commonwealth of Virginia,

Petitioner,

versus

Carol M. Browner, etc., et al,

Respondents.

O R D E R

The Court further amends its opinion filed March 26 and amended April 17, 1996, as follows:

On page 5, second full paragraph, lines 1-2 -- the word "plans" is corrected to read "programs" and the parenthetical phrase "('State Implementation Plans' or 'SIPs')" is deleted.

On page 5, second full paragraph, line 4, and third full paragraph, line 1 (two instances); page 8, second full paragraph, line 1; page 9, second full paragraph, lines 3 and 6; page 10, third full paragraph, lines 2 and 3; page 18, first full paragraph, line 1, and second full paragraph, line 2 -- the phrase "SIP" is corrected to read "permit program."

On page 9, third full paragraph, line 2; page 10, fourth full paragraph, line 1; page 11, first full paragraph, line 1; page 13, second full paragraph, line 6; page 19, footnote 6, lines 3, 5, and 6 -- the phrase "SIP" is corrected to read "<u>state permit program</u>."

On page 8, first full paragraph -- the second sentence is corrected to read "If the state does not gain approval for its permit program, EPA develops and implements its own Title V permitting program within the noncomplying state."

On page 8, third full paragraph, section (1), line 1; section (2), line 1; section (3), line 1; section (4), line 1; and section (5), line 1 -- the word "plan" in each section is corrected to read "<u>proposed program</u>."

On page 19, first full paragraph, line 4 -- the comma after the word "rules" is changed to a semicolon.

On page 19, footnote 6, line 8 -- the phrase "violations of an applicable implementation program" is corrected to read "<u>violations of . . . an approved permit program under subchapter [Title] V</u>."

On page 19, footnote 6, lines 9-12 -- the sentence is corrected to read "EPA has not approved Virginia's proposed Title V program, so no 'approved permit program' yet exists to trigger any § 113 sanctions against any Virginia official."

On page 22, fourth full paragraph, line 1 -- the phrase "FIP" is corrected to read "<u>federal permit program</u>."

On page 24, first paragraph, lines 8-10 -- the sentence is corrected to read "Instead, we interpreted the regulations as authorizing EPA to implement a federal pollution control program directly."

On page 24, first paragraph, line 13 -- the phrase "the FIP" is corrected to read "<u>federal implementation</u>."

On page 24, second full paragraph, line 2 -- the phrase "State Implementation Plan" is corrected to read "<u>state permit program</u>."

For the Court - By Direction


/s/ Bert M. Montague

Clerk

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 95-1052

_____

Commonwealth of Virginia,

Petitioner,

versus

Carol M. Browner, etc., et al,

Respondents.

_____

O R D E R

_____

The Court amends its opinion filed March 26, 1996, as follows:

On page 3, section 1, lines 9-10 -- "Louis J. Schiffer" is corrected to read "<u>Lois</u> J. Schiffer."

For the Court - By Direction

/s/ Bert M. Montague
_____
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

COMMONWEALTH OF VIRGINIA,
Petitioner,

v.

CAROL M. BROWNER, Administrator,
U. S. Environmental Protection
Agency; ENVIRONMENTAL PROTECTION
AGENCY,
Respondents,

AMERICAN LUNG ASSOCIATION OF
NORTHERN VIRGINIA, AND AMERICAN
LUNG ASSOCIATION OF VIRGINIA;
CLEAN WATER ACTION;
FRIENDS OF THE RIVERS OF VIRGINIA;

THE JAMES RIVER ASSOCIATION;
MOUNTAIN HERITAGE ALLIANCE;
VALLEY CONCERNED CITIZENS;
VIRGINIA CHAPTER OF THE SIERRA
CLUB; VIRGINIA CITIZEN ACTION;
VIRGINIA CONSORTIUM FOR CLEAN
AIR; VIRGINIA COUNCIL, TROUT
UNLIMITED; ENVIRONMENTAL DEFENSE
FUND, INCORPORATED; KATHLEEN F.
DERRICOTT; CLIFTON E. DERRICOTT;
ANDRE L. BROWN; CALEATA JOHNSON;
GWEN HEDGEPATH; AUDUBON
NATURALIST SOCIETY,
Intervenors.

No. 95-1052

VIRGINIA MANUFACTURERS
ASSOCIATION; WASHINGTON LEGAL
FOUNDATION; OGDEN MARTIN
SYSTEMS OF LANCASTER,
INCORPORATED; OGDEN MARTIN
SYSTEMS OF ALEXANDRIA,
INCORPORATED; NATIONAL
INDEPENDENT ENERGY PRODUCERS;
OGDEN MARTIN SYSTEMS OF
MONTGOMERY, INCORPORATED; OGDEN
MARTIN SYSTEMS OF FAIRFAX,
INCORPORATED; CHESAPEAKE BAY
FOUNDATION,
<u>Amici Curiae.</u>

On Petition for Review of an Order
of the United States Environmental Protection Agency.

Argued: December 4, 1995

Decided: March 26, 1996

Before MURNAGHAN and MICHAEL, Circuit Judges, and
MICHAEL, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Petition for review denied by published opinion. Circuit Judge
Michael wrote the opinion, in which Judge Murnaghan and Senior
District Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Mary Jo Leugers, Assistant Attorney General, Richmond,
Virginia, for Petitioner. David Jay Kaplan, Environmental Defense

2

Section, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Katherine E. Slaughter, SOUTHERN ENVIRONMENTAL LAW CENTER, Charlottesville, Virginia, for Intervenors. **ON BRIEF:** James S. Gilmore, III, Attorney General, John Paul Woodley, Jr., Deputy Attorney General, Roger L. Chaffe, Senior Assistant Attorney General, John R. Butcher, Assistant Attorney General, Richmond, Virginia; John P. Schmitz, Thomas Dilenge, MAYER, BROWN & PLATT, Washington, D.C., for Petitioner. Lois J. Schiffer, Assistant Attorney General, Ronald Spritzer, Robin M. Richardson, Environmental Defense Section, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Michael W. Thrift, Office of General Counsel, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Washington, D.C.; Cecil A. Rodrigues, Office of Regional Counsel, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Philadelphia, Pennsylvania, for Respondents. Deborah Murray Wassenaar, SOUTHERN ENVIRONMENTAL LAW CENTER, Charlottesville, Virginia; David S. Bailey, LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C., for Intervenors. Carol C. Raper, Vice President and General Counsel, VIRGINIA MANUFACTURERS ASSOCIATION, Richmond, Virginia; George A. Somerville, MAYS & VALENTINE, Richmond, Virginia, for Amicus Curiae Virginia Manufacturers Association. Daniel J. Popeo, David A. Price, WASHINGTON LEGAL FOUNDATION, Washington, D.C., for Amicus Curiae Washington Legal Foundation. Deborah E. Jennings, Michael C. Carter, Norman L. Rave, PIPER & MARBURY, Baltimore, Maryland, for Amici Curiae National Independent Energy Producers, et al. Roy A. Hoagland, Virginia Assistant Director/Staff Attorney, CHESAPEAKE BAY FOUNDATION, INC., Richmond, Virginia, for Amicus Curiae Chesapeake Bay Foundation.

_____

**OPINION**

MICHAEL, Circuit Judge:

The Commonwealth of Virginia petitions for review of the Environmental Protection Agency's final action disapproving Virginia's

3

proposed program for issuing air pollution permits. Specifically, Virginia challenges EPA's finding that Virginia has failed to comply with Title V of the 1990 Amendments to the Clean Air Act (sometimes "CAA" or the "Act"), CAA §§ 501-507, 42 U.S.C. §§ 7661-7661f, because Virginia's proposal lacks adequate provisions for judicial review of the Commonwealth's permitting decisions. Virginia also challenges the constitutionality of Title V and its sanctions provisions, CAA §§ 179(b) & 502(d), 42 U.S.C. §§ 7509(b) & 7661a(d). According to Virginia, these provisions improperly commandeer the legislative processes of the states, in violation of the Tenth Amendment and the Spending Clause, U.S. Const. art. I § 8, cl. 1. We have jurisdiction over all of Virginia's claims, see CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1), and we find them to be without merit.

I.

A.

Because Virginia claims that the EPA has misinterpreted Title V and that Title V is unconstitutional as well, a brief discussion of the statute's structure and purposes is in order.

Title V's key provision, CAA § 502, 42 U.S.C. § 7661a, prohibits major stationary sources of air pollution from operating either without a valid permit or in violation of the terms of a permit.[1] The permit is crucial to the implementation of the Act: it contains, in a single, comprehensive set of documents, all CAA requirements relevant to the particular polluting source. Clean Air Act Amendments of 1990: Chafee-Baucus Statement of Senate Managers (Conf. Rep. No. 952, 101st Cong., 2d Sess.) ("Chafee-Baucus Statement"), reprinted in 136 Cong. Rec. S16933, S16983 (daily ed. Oct. 27, 1990). In a sense, a permit is a source-specific bible for Clean Air Act compliance.

_____

[1] A "stationary source" is defined in CAA §§ 112(a)(1), 182(b)(1)(A)(ii)(I), 182(c), 182(d), 182(e), 302(j), & 501(2); 42 U.S.C. §§ 7412(a)(1), 7511a(b)(1)(A)(ii)(I), 7511a(c), 7511a(d), 7511a(e), 7602(j), & 7661(2). Stationary sources, such as power plants and factories, are distinguished from mobile sources, such as automobiles.

4

Title V of the Act contemplates that states will administer and enforce the permitting program:

> [T]he permit program is predicated on the principle that the primary responsibility for its day-to-day administration will rest squarely with state and local air pollution agencies. While EPA has an important role of providing guidance and general oversight, the agency should not unduly interfere with states' implementation of the permit program.

Chafee-Baucus Statement at S16983.

States are directed to submit for EPA approval their own programs for issuing permits. CAA § 502(d)(1), 42 U.S.C. § 7661a(d)(1). EPA may not approve a proposed permit program unless it meets certain minimum criteria set out in CAA § 502(b), 42 U.S.C. § 7661a(b). Among other things, states must design a standard permit application form (§ 502(b)(1)), adequately staff and fund the permit program (§ 502(b)(4)), develop a plan to ensure permit compliance (§ 502(b)(5)), provide public access to documents submitted in support of permit applications (§ 502(b)(8)), and provide for review in state courts of permitting decisions (§ 502(b)(6)).

If a state fails to submit a permit program, or submits a permit program that EPA disapproves for failure to comply with CAA § 502(b), the state becomes subject to sanctions designed to encourage compliance. CAA § 502(d), 42 U.S.C. § 7661a(d).[2]

One sanction deprives states of certain federal highway funds. CAA § 179(b)(1), 42 U.S.C. § 7509(b)(1). However, the state loses no funds that would be spent in regions that are in "attainment" within

_____

[2] We discuss the timing of sanctions in greater detail in our opinion in a related case, Virginia v. United States (Virginia I), No. 95-2229 (4th Cir. Feb. 2, 1996). Sanctions are mandatory, but they may be imposed earlier than mandated by the statute if EPA finds, after holding a notice-and-comment rulemaking proceeding, that early imposition of sanctions is necessary to encourage compliance. See CAA §§ 502(d) & (i), 42 U.S.C. §§ 7661a(d) & (i).

5

the meaning of the Act.**3** CAA § 179(b)(1)(A), 42 U.S.C. § 7509(b)(1)(A). And, even within "nonattainment" areas, funds remain available for highway projects that "resolve a demonstrated safety problem and likely will result in a significant reduction in, or avoidance of, accidents." Id. Finally, federal funds may be spent on many other types of transportation projects within nonattainment areas, including:

> (i) capital programs for public transit;

> (ii) construction or restriction of certain roads or lanes solely for the use of passenger buses or high occupancy vehicles;

> (iii) planning for requirements for employers to reduce employee work-trip-related vehicle emissions;

> (iv) highway ramp metering, traffic signalization, and related programs that improve traffic flow and achieve a net emission reduction;

> (v) fringe and transportation corridor parking facilities serving multiple occupancy vehicle programs or transit operations;

> (vi) programs to limit or restrict vehicle use in down-town areas or other areas of emission concentration particularly during periods of peak use, through road use charges, tolls, parking surcharges, or other pricing mechanisms, vehicle restricted zones or periods, or vehicle registration programs;

_____

**3** We explain the concepts of "attainment" and "nonattainment" in greater detail in Virginia I. In brief, an area is in nonattainment with respect to a pollutant if levels of that pollutant in the ambient (breathable) air exceed a threshold level set by EPA. An ozone nonattainment area, for example, has what EPA has determined to be a sufficient amount of ozone in the air to cause health problems.

6

(vii) programs for breakdown and accident scene management, nonrecurring congestion, and vehicle information systems, to reduce congestion and emissions; and

(viii) such other transportation-related programs as the [EPA] Administrator, in consultation with the Secretary of Transportation, finds would improve air quality and would not encourage single occupancy vehicle capacity. In considering such measures, the State should seek to ensure adequate access to downtown, other commercial, and residential areas, and avoid increasing or relocating emissions and congestion rather than reducing them.

CAA § 179(b)(1)(B), 42 U.S.C. § 7509(b)(1)(B).

A second sanction increases the pollution offset requirements already imposed on private polluters within ozone nonattainment areas. Normally, new major stationary sources of pollution may not be operated within nonattainment areas (and existing stationary sources may not be modified if the modification would increase emissions) unless pollution from other sources is reduced to offset increased pollution from the new or modified source. In regions of "marginal" nonattainment with respect to ozone, 110 tons of old pollution must be eliminated for every 100 additional tons of new pollution (a ratio of 1.1:1). CAA § 182(a)(4), 42 U.S.C. § 7511a(a)(4). In regions of "moderate" nonattainment, 115 tons of old pollution must be eliminated for every additional 100 tons of new pollution (a ratio of 1.15:1). CAA § 182(b)(5), 42 U.S.C. § 7511a(b)(5). In regions of "serious," "severe," or "extreme" nonattainment with respect to ozone, 120 tons of old pollution must be eliminated for every additional 100 tons of new pollution (a ratio of 1.2:1). CAA §§ 182(c)(10), (d), & (e); 42 U.S.C. § 7511a(c)(10), (d), & (e). In regions of "severe" and "extreme" nonattainment, higher ratios are mandated for certain pollutants. See CAA §§ 182(d)(2) & (e)(1); 42 U.S.C. §§ 7511a(d)(2) & (e)(1). The sanction supersedes these normal ratios by increasing the ratio in all ozone nonattainment areas to 2:1, requiring 200 tons of old pollutants to be eliminated for every 100 tons of new pollutants allowed. CAA § 179(b)(2), 42 U.S.C. § 7509(b)(2). The offset sanction, therefore, could slow the rate of industrial development within a noncomplying state.

A third sanction eliminates the state's ability to manage its own pollution control regime. If the state does not gain approval for its permit program, EPA develops and implements its own Title V permitting program within the noncomplying state. CAA § 502(d)(3), 42 U.S.C. § 7661a(d)(3). The state is not required to do anything to assist EPA in this effort; the federal government becomes wholly responsible.

B.

Virginia submitted a proposed Title V permit program to EPA on November 12, 1993, and January 14, 1994. EPA then opened a notice and comment period. EPA published notice of its intent to disapprove Virginia's proposal on June 17, 1994, 59 Fed. Reg. 31183, and Virginia responded to EPA's notice. After considering Virginia's comments, as well as the comments of others, EPA took final action disapproving Virginia's proposed Title V program on December 5, 1994. 59 Fed. Reg. 62324.

EPA based its disapproval on five grounds:

(1) the proposed program contained inadequate judicial review provisions, in violation of CAA § 502(b)(6) (42 U.S.C. § 7661a(b)(6)) and 40 C.F.R. § 70.4(b)(3)(x) & 70.7(h);

(2) the proposed program would have allowed certain permits to be issued by default, in violation of § 505(b)(3) (42 U.S.C. § 7661d(b)(3)) and 40 C.F.R. § 70.8(e);

(3) the regulations that would have implemented the proposed program had expired without being re-promulgated;

(4) the proposed program did not "require issuance of permits to the proper universe of sources required by 40 CFR part 70"; and

(5) the proposed program did not "contain regulations meeting the requirements of 40 CFR part 70 to ensure issuance of permits that contain all applicable Federal requirements," and

8

did not "correctly delineate provisions only enforceable by" Virginia.

See id. at 62324-25.

Virginia filed a petition for review in this Court on January 9, 1995.**4** Since that date Virginia has revised portions of its original proposal and now claims that it has corrected defects (2) through (5). EPA has not yet determined whether those defects have actually been corrected.

The claims in Virginia's petition to us fall into three broad categories. First, Virginia argues that because it has corrected defects (2) through (5) in its proposed permit program, we should remand the case to EPA for a new determination of whether the corrected version complies with the Act. Second, Virginia argues that EPA's disapproval of the originally proposed permit program was arbitrary and capricious. Third, Virginia argues that Title V of the CAA and its sanctions provisions are unconstitutional because the Act represents an attempt by Congress to coerce Virginia into exercising its sovereign legislative power. We consider each claim in turn.

II.

Virginia suggests that we must remand this case to EPA because four of the five defects in its originally proposed Title V state permit program have been corrected. We believe, however, that a remand would be inappropriate.

First, Virginia concedes that EPA properly disapproved its original submission on the basis of defects (2) through (5). We may affirm the agency on this basis, and this basis alone, if the CAA passes constitutional muster. Although the EPA "Administrator may approve a program [just] to the extent that the program meets the requirements of" the Act, she is not required to do so, and she has the authority to dis-

_____

**4** Virginia simultaneously filed suit, Virginia I, in the district court for the Eastern District of Virginia. In Virginia I we affirmed the district court's decision to dismiss for lack of subject matter jurisdiction.

9

approve the entire program on the basis of one defect. CAA § 502(d)(1), 42 U.S.C. § 7661a(d)(1).

Second, EPA has not yet determined whether Virginia's new submission is adequate, because EPA has not completed the notice and comment rulemaking proceeding required by CAA § 502(d)(1). And absent any agency record, we have no way of knowing whether the new submission in fact complies with the CAA, as Virginia claims. See Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 331-34 (1976) (per curiam); cf. Virginia Agric. Growers Ass'n v. Donovan, 774 F.2d 89, 92 (4th Cir. 1985) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court") (quoting Camp v. Pitts, 411 U.S. 138, 143 (1973)); Deukmejian v. Nuclear Regulatory Comm'n, 751 F.2d 1287, 1325 (D.C. Cir. 1984) ("judicial reliance on an agency's stated rationale and findings is central to a harmonious relationship between agency and court"), aff'd in pertinent part sub. nom. San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n, 789 F.2d 26 (D.C. Cir. 1986) (en banc), cert. denied, 479 U.S. 923 (1986).

A remand would serve no useful purpose here, and accordingly we reject Virginia's suggestion.

III.

Virginia claims that EPA erroneously determined that Virginia's permit program contained inadequate judicial review provisions (defect (1)). EPA's finding that Virginia submitted a deficient permit program must be upheld unless that finding is "arbitrary, capricious, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We find that EPA correctly determined that Virginia's proposed judicial review provisions do not comply with the Act. Therefore, even if EPA had based its disapproval solely on defect (1), such disapproval would not have been arbitrary and capricious.

A.

CAA § 502(b)(6), 42 U.S.C. § 7661a(b)(6), provides that a state permit program must contain:

10

> Adequate, streamlined, and reasonable procedures for expeditiously determining when applications are complete, for processing such applications, for public notice, including offering an opportunity for public comment and a hearing, and for expeditious review of permit actions, including applications, renewals, or revisions, and including <u>an opportunity for judicial review in State court of the final permit action by the applicant, any person who participated in the public comment process, and any other person who could obtain judicial review of that action under applicable law</u>.

(Emphasis supplied.)

The emphasized portion of this provision is at issue here. A state permit program will be disapproved unless the state submits a legal opinion stating that the proposed Title V program allows state court review of permitting decisions upon the request of "the [permit] applicant, any person who participated in the public participation process. . . and any other person who could obtain judicial review of such actions under State laws." 40 C.F.R. § 70.4(b)(3)(x). EPA interprets the statute and regulation to require, at a minimum, that states provide judicial review of permitting decisions to any person who would have standing under Article III of the United States Constitution. <u>Notice of Proposed Disapproval</u>, 59 Fed. Reg. 31183, 31184 (June 17, 1994).

Virginia law grants standing to seek judicial review of permitting decisions to "[a]ny owner aggrieved by" such decisions. Va. Code § 10.1-1318(A). This provision satisfies CAA § 502(b)(6)'s requirement that the permit "applicant" be allowed to seek judicial review. But § 502(b)(6) also requires that states grant certain standing rights to members of the public, and here is where Virginia's judicial review provision falls short of the mark. Under Virginia's provision, a member of the public "who is aggrieved by a final[permitting decision] who participated, in person or by submittal of written comments, in the public comment process" may only seek judicial review of a permitting decision if he can establish that

> (i) [he] has suffered an actual, threatened, or imminent injury; (ii) such injury is an invasion of an immediate, legally protected, <u>pecuniary and substantial</u> interest which

11

is concrete and particularized; (iii) such injury is fairly traceable to the [permitting decision] and not the result of the action of some third party not before the court; and (iv) such injury will likely be redressed by a favorable decision of the court.

Va. Code § 10.1-1318(B) (emphasis supplied).

According to EPA, this provision is too restrictive: limiting availability of review to those persons with "pecuniary and substantial" interests violates CAA § 502(b)(6). We agree with EPA.

B.

1.

Virginia argues that the text of CAA § 502(b)(6) does not require states to slacken their rules of judicial standing at all.

The critical language to be examined is: "an opportunity for judicial review in State court of the final permit action by the applicant, any person who participated in the public comment process, and any other person who could obtain judicial review of that action under applicable law."

As Virginia reads the statute, the final clause,"who could obtain judicial review of that action under applicable[state] law," modifies all three categories of persons earlier described as being allowed to seek judicial review: "the applicant," "any person who participated in the public comment process," and "any other person." Thus, according to Virginia, § 506(b)(6) requires states to grant standing to participants in the public comment process only if those persons would otherwise have standing under existing state law.

Virginia's proposed reading is contrary to ordinary principles of statutory construction and to the rules of English usage. The clause, "who could obtain judicial review of that action under applicable law," modifies only the immediately preceding category, "any other person." An elementary principle of statutory construction is the "last

12

antecedent" rule, which holds that ordinarily a clause modifies only its nearest antecedent. In re Grewe, 4 F.3d 299, 302 (4th Cir. 1993), cert. denied, 114 S. Ct. 1056 (1994). Furthermore, if the last antecedent rule does not apply, and the clause modifies all three categories, then there would have been no need for Congress to have included the first two categories. The statute could have been written simply to say that standing should be given to "any person" who complied with state standing rules. A court should not -- and we will not -- construe a statute in a manner that reduces some of its terms to mere surplusage. See Arkansas Best Corp. v. Commissioner, 485 U.S. 212, 218 (1988).

Properly read, the final clause simply allows the states to grant broader standing rights than those otherwise required under federal law.

> This provision ensures that existing provisions of law governing the availability of review of final actions on permit applications are in no way limited, and that interested persons who arguably are affected by permit decisions are guaranteed their day in court.

Chafee-Baucus Statement, 136 Cong. Rec. at S169941. In other words, the clause "who could obtain judicial review of that action under applicable law" creates a floor of rights, rather than a ceiling, and ensures that the CAA does not inadvertently diminish standing rights previously granted under state laws.

2.

A literal reading of the latter part of § 502(b)(6), then, would require that a state allow "any person who participated in the public comment process" to seek judicial review of permitting decisions. EPA, however, does not require that states go that far in providing for judicial review. EPA has determined that § 502(b)(6) is satisfied (and that therefore a state permit program may be approved) if a state grants standing only to those participants in the public comment process who would have Article III standing to sue in federal court.**5**

_____

**5** For Article III standing purposes, a potential litigant must show (1) actual or imminent injury that is concrete and particularized, (2) causal

13

This determination is justified by analysis of the opening portion of § 502(b)(6), which requires that states provide "[a]dequate, streamlined, and reasonable procedures for expeditiously" making permitting decisions. The two parts of the section must be harmonized, and EPA has done that by creating a safe harbor keyed to Article III standing.

But Virginia claims that because EPA agrees that § 502(b)(6), when read in its entirety, is ambiguous, the states may propose any Title V program that reasonably accommodates the statute's disharmonious provisions. Virginia claims that because its "pecuniary and substantial interest" requirement is a reasonable way to resolve the tension inherent in § 502(b)(6), EPA was arbitrary and capricious in its decision to reject Virginia's proposal.

We disagree. EPA's interpretation, if reasonable, must take precedence over any interpretation Virginia could offer or, indeed, even over any alternative interpretation we could formulate. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844 (1984). We defer to EPA's definition of the bounds of the § 502(b)(6) safe harbor because "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Id. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

EPA's interpretation of the judicial review portion of CAA § 502(b)(6) harmonizes it with the portion that requires states to provide "[a]dequate, streamlined, and reasonable procedures." We find EPA's importation of Article III principles to resolve the slight tension within CAA § 502(b)(6) to be reasonable. The Article III test is convenient to apply, primarily because a body of national caselaw interpreting Article III standing requirements already exists. See, e.g., Sammon v. New Jersey Bd. of Medical Examiners, 66 F.3d 639, 642 (3d Cir. 1995); Chambers Medical Technologies v. Bryant, 52 F.3d

_____

connection between the challenged conduct and the injury, and (3) likelihood that the injury would be redressed by favorable judicial action. Lujan v. Defenders of Wildlife, 112 S. Ct. 2130, 2136 (1992).

14

1252, 1265 (4th Cir. 1995); Williams v. Lambert , 46 F.3d 1275, 1278 (2d Cir. 1995); Ass'n for Retarded Citizens v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees, 19 F.3d 241, 243 (5th Cir. 1994); Adams v. Watson, 10 F.3d 915, 918 (1st Cir. 1993); Banks v. Secretary of Indiana Family and Social Servs. Admin., 997 F.2d 231, 238 (7th Cir. 1993); Central Ariz. Water Conservation Dist. v. United States EPA, 990 F.2d 1531, 1537-38 (9th Cir.), cert. denied, 114 S. Ct. 94 (1993). Because EPA's "answer is based upon a permissible construction of the statute," we will follow EPA's choice of interpretation. Chevron, 467 U.S. at 843; accord Monongahela Power Co. v. Reilly, 980 F.2d 272, 278-79 (4th Cir. 1992).

Virginia argues that Chevron deference is inappropriate because EPA's area of expertise is the environment, not jurisdictional rules. See Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 914-15 (3d Cir. 1981). Again, we disagree. "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." Chevron, 467 U.S. at 844. Congress has charged EPA with inducing the states to implement a permitting program that satisfies certain judicial review requirements, and if Congress has decided that EPA has sufficient expertise in the area, it is not our place to say otherwise. See Cass R. Sunstein, Law and Administration After Chevron, 90 Colum. L. Rev. 2071, 2097 (1990) ("an ad hoc inquiry into administrative competence would be an exceptionally poor way to handle the question whether Chevron applies").

Virginia also claims that Gregory v. Ashcroft, 501 U.S. 452 (1991), mandates a different result. Virginia is again mistaken. Gregory simply stands for the proposition that when congressional intent is unclear, a statute should be construed to avoid a constitutional question. That principle has no relevance in this case because here it is manifestly clear that Congress specifically intended that the states conform their judicial standing rules to meet the § 502(b)(6) standard. See Association of Community Orgs. for Reform Now (ACORN) v. Edgar, 56 F.3d 791, 796 (7th Cir. 1995); United States v. Lot 5, 23 F.3d 359, 362 (11th Cir. 1994), cert. denied, 115 S. Ct. 722 (1995); EEOC v. Massachusetts, 987 F.2d 64, 69 (1st Cir. 1993).

In Gregory the Supreme Court faced the question whether the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34,

15

applied to state judges. The ADEA contained no express reference to state courts or judges, and therefore the Court concluded that the statute did not apply. If the statute did apply to state judges, the Court reasoned, then an inquiry into key federalism concerns would be required. Specifically, could Congress, under the guise of an antidiscrimination statute, alter the qualifications for state judges, or would doing so violate the Tenth Amendment? The Court held that it would construe the ADEA in a manner that would allow it to avoid the constitutional question. Because the statute did not expressly say that it applied to state judges, and because a difficult constitutional question would have been presented if the statute did in fact apply to state judges, the statute was interpreted as not applying to state judges.

The Clean Air Act contains no ambiguity of the kind present in Gregory. Even if EPA's interpretation of CAA § 502(b)(6) can be said to implicate Tenth Amendment concerns by intruding upon what Virginia claims to be a core element of its sovereignty, see IV.A, infra, that interpretation is specifically authorized by the "plain statement" of Congress. Gregory, 501 U.S. at 461. In Gregory, the question was whether the ADEA applied to the state judiciary at all. Here, by contrast, Congress intended CAA § 502(b)(6) to apply to state courts, and Congress made "its intention unmistakably clear in the language of the statute." Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985). By its terms, § 502(b)(6) could apply to nothing but state courts.

Here, EPA resolved the slight tension within § 502(b)(6) by interpreting the section to require that states, at a minimum, extend judicial review rights to participants in the state public comment process who satisfy the standard for Article III standing. This resolution is both authorized by Congress and reasonable, and therefore we must reject Virginia's alternative interpretation.

3.

Virginia also argues that even if the Article III test is proper, Virginia's "pecuniary and substantial interest" requirement satisfies it. Again, we disagree.

16

A plaintiff need not show "pecuniary" harm to have Article III standing; injury to health or to aesthetic, environmental, or recreational interests will suffice. See, e.g., United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 686-87 (1973); Sierra Club v. Morton, 405 U.S. 727, 734 (1972).

In recent cases, Virginia courts have denied standing to plaintiffs who would have met Article III's standing requirements. For example, in Fries v. State Water Control Bd., 409 S.E.2d 634, 637 (Va. Ct. App. 1991), it was held that a town lacked standing to seek judicial review of the decision of the State Water Control Board to grant a permit, even though the permit allowed a sewage treatment plant to discharge waste directly upstream of the town. Standing also was denied to individual riparian landowners. The court held that "an anticipated public injury" was not "an immediate, pecuniary, and substantial interest" such that standing should be allowed. Id.; see also Citizens for Clean Air v. Commonwealth, 412 S.E.2d 715, 719-21 (Va. Ct. App. 1991) (because unincorporated association was not an "owner aggrieved" under Virginia law, association was denied standing to challenge permitting decision of State Air Pollution Control Board, even though association members owned real estate near plant granted permit, were bothered by foul odors emitted by plant, and alleged decline in property values); Environmental Defense Fund v. Virginia State Water Control Bd., 404 S.E.2d 728, 731-32 (Va. Ct. App. 1991) (standing denied to association seeking review of water pollution permit decision, even though association represented both recreational users of a river and riparian landowners).

Virginia caselaw makes it clear that the "pecuniary and substantial interest" requirement is more stringent than Article III's requirement of concrete and particularized injury.

4.

Section 502(b)(6)'s requirement of broad availability of judicial review is necessary to ensure that the required public comment period serves its proper purpose. The comment of an ordinary citizen carries more weight if officials know that the citizen has the power to seek judicial review of any administrative decision harming him. EPA recently recognized this principle in another context:

17

When citizens are denied the opportunity to challenge executive decisions in court, their ability to influence permitting decisions through other required elements of public participation, such as through public comments and public hearings on proposed permits, may be seriously compromised. If citizens perceive that a state is not addressing their concerns about [ ] permits because the citizens have no recourse to an impartial judiciary, that perception also has a chilling effect on all the remaining forms of public participation in the permitting process.

Amendment to Requirements for Authorized State Permit Programs Under Section 402 of the Clean Water Act, 60 Fed. Reg. 14588, 14589 (March 17, 1995) (notice of proposed rulemaking).

5.

Because Virginia's permit program did not provide the minimum judicial review rights required under § 506(b)(6), it was not arbitrary and capricious for EPA to disapprove Virginia's submission.

IV.

Having determined that EPA had a valid reason to disapprove Virginia's permit program, we now examine whether Title V and its sanctions provisions are constitutional. Virginia claims that Title V and its sanctions provisions are unconstitutional because they impinge upon a fundamental element of state sovereignty, the state's right to articulate its own rules of judicial standing. Even assuming arguendo the accuracy of Virginia's assertion that its standing rules are within the core of its sovereignty, we find no constitutional violation because federal law "may, indeed, be designed to induce state action in areas that otherwise would be beyond Congress' regulatory authority." FERC v. Mississippi, 456 U.S. 742, 766 (1982). As we explain below, we believe that if Virginia chooses to change its rules of judicial standing, it will make the change only because the CAA's sanctions provisions induce it to do so, not because they coerce it.

A.

We agree that Congress lacks power to impinge upon "the core of sovereignty retained by the States." New York v. United States, 112

18

S. Ct. 2408, 2419 (1992). We also agree that an important aspect of a state's sovereignty is the administration of its judicial system. <u>See</u> <u>Gregory</u>, 501 U.S. at 460. Thus, a state cannot be required to create a court with power to decide federal claims, if no court otherwise exists. <u>Howlett v. Rose</u>, 496 U.S. 356, 372 (1990). Similarly, a state may apply neutral venue rules to require that federal claims be brought in a particular state court. <u>Herb v. Pitcairn</u>, 324 U.S. 117, 123 (1945), <u>overruled in part on other grounds by Michigan v. Long</u>, 463 U.S. 1032 (1983). But the Supremacy Clause compels state judges to apply federal law, if such law is applicable. U.S. Const. art. VI, cl. 2. Furthermore, to require an existing state administrative body to adjudicate a dispute arising under federal law does not unreasonably interfere with state sovereignty. <u>FERC</u>, 456 U.S. at 760; <u>see also Testa v.</u> <u>Katt</u>, 330 U.S. 386 (1947) (state court must entertain civil action arising under federal Emergency Price Control Act); <u>E.A. v. State</u>, 623 P.2d 1210, 1215 n.13 (Alaska, 1981) (state court must exercise jurisdiction over actions brought pursuant to federal Indian Child Welfare Act); <u>cf. Mack v. United States</u>, 66 F.3d 1025, 1029-30 (9th Cir. 1995) (state law enforcement officials may be required to assist in operation of federal law enforcement scheme).

We need not decide whether judicial standing rules fall within the core of sovereignty identified in <u>Gregory</u> and <u>Howlett</u>, <u>supra</u>, because we find that the CAA does not compel the states to modify their standing rules; it merely induces them to do so. **6** The CAA is constitu-

---

**6** In its brief and during oral argument Virginia claimed that CAA § 113, 42 U.S.C. § 7413, exposes the state and its elected officials to civil and criminal liability for failure to promulgate a valid state permit program. A careful reading of this section, however, discloses that it provides for enforcement of an <u>approved</u> state permit program. Sanctions under § 113 may not be used to force Virginia to promulgate any state permit program, and EPA has not proposed invoking § 113 in this case. Sanctions under this section are available only to redress "violations of . . . an approved permit program under subchapter [Title] V." CAA § 113(a)(2), 42 U.S.C. § 7413(a)(2). EPA has not approved Virginia's proposed Title V program, so no "approved permit program" yet exists to trigger any § 113 sanctions against any Virginia official. In addition, EPA has expressed no intention to seek § 113 sanctions against Virginia officials in the future. For these reasons, a constitutional challenge to § 113 is unripe. <u>Renne v. Geary</u>, 501 U.S.

19

tional because although its sanctions provisions potentially burden the states, those sanctions amount to inducement rather than "outright coercion." See New York 112 S. Ct. at 2423. We examine each sanction separately to explain how we reach this conclusion. See id. at 2425.

B.

Two sources of Congressional power allow use of the highway sanction. Because the elimination of air pollution promotes the general welfare, Congress may tie the award of federal funds to the states' efforts to eliminate air pollution. "The Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I § 8, cl. 1. Furthermore, the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, gives Congress the power to regulate "activities causing air or water pollution, or other environmental hazards that may have effects in more than one State." Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 282 (1981).

Generally, Congress may use the power of the purse to encourage states to enact particular legislation. New York, 112 S. Ct. at 2423. This power, however, is not limitless. Exercise of the power to the point of "outright coercion" violates the Constitution. Id. "[I]n some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which `pressure turns into compulsion.'" South Dakota v. Dole, 483 U.S. 203, 211 (1987) (quoting Steward Machine Co. v. Davis, 301 U.S. 548, 590 (1937)).**7** Also, it has been suggested that federal funds may be subject to conditions

───────────────────────────────

312, 321-22 (1991). The threat of such sanctions has not been "felt in a concrete way by" any Virginia official. Reno v. Catholic Social Servs., Inc., 113 S. Ct. 2485, 2495 (1993) (quoting Abbott Labs., Inc. v. Gardner, 387 U.S. 136, 148 (1967)); accord Lujan v. National Wildlife Fed'n, 497 U.S. 871, 891 (1990).

**7** In South Dakota the Supreme Court upheld an Act of Congress that denied a percentage of highway funds to states that refused to enact a minimum drinking age of 21.

20

"only in ways reasonably related to the purpose for which the funds are expended." South Dakota, 483 U.S. at 213 (O'Connor, J., dissenting); see also New York, 112 S. Ct. at 2426. No court, however, has ever struck down a federal statute on grounds that it exceeded the Spending Power. See Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989), cert. denied, 493 U.S. 1070 (1990).

The highway sanction here does not rise to the level of "outright coercion." First, a state does not lose any highway funds that would be spent in areas of the state that are in attainment. CAA § 179(b)(1)(A), 42 U.S.C. § 7509(b)(1)(A). Second, even within non-attainment areas, federal highway funds may be spent on projects designed to promote safety or designed to reduce air pollution. CAA § 179 (b)(1), 42 U.S.C. § 7509(b)(1). More severe funding restrictions than those at issue here have been upheld. See, e.g., New York, 112 S. Ct. at 2426-27; Skinner, supra (virtually all highway funds); Oklahoma v. Schweiker, 655 F.2d 401 (D.C. Cir. 1981) (all Medicaid funds); Nebraska, Dep't of Roads v. Tiemann, 510 F.2d 446 (8th Cir. 1975) (broad category of highway funds).

Virginia concedes that it is allowed to spend federal money on safety projects, on projects that will reduce pollution, and on projects within areas that are in attainment. The Commonwealth contends, however, that because it is difficult to shift funds from one transportation project to another, these exemptions do not reduce the sanction's coercive effect. According to Virginia, it simply lacks the time to reallocate funds away from highway projects it has already planned for nonattainment areas. To this argument we can only say that Title V was enacted in 1990, and the states have had more than five years either to comply or to prepare themselves for the consequences of noncompliance.

And contrary to what Virginia claims, the conditions on spending are reasonably related to the goal of reducing air pollution. The CAA as a whole is a comprehensive scheme to cope with the problem of air pollution from all sources. Congress may ensure that funds it allocates are not used to exacerbate the overall problem of air pollution. It is therefore of no consequence that a highway sanction, which will have the effect of reducing emissions from mobile pollution sources,

21

is being used to induce compliance with a portion of the Act designed to reduce emissions from stationary sources.

We hold that the highway sanction, CAA § 179(b)(1), is a valid exercise of the Spending Power. As a valid exercise of that power, it also comports with the requirements of the Tenth Amendment. New York, 112 S. Ct. at 2427. Congress has not overstepped its bounds here.

C.

The offset sanction, CAA § 179(b)(2), 42 U.S.C. § 7509(b)(2), which limits new construction or modification of major stationary sources of air pollution, is constitutional because it regulates private pollution sources, not states.

The burden of the offset sanction falls on private parties. The more stringent offset requirements will likely make it more difficult for individual pollution sources (manufacturers, utilities, and the like) to upgrade or modify existing plants and equipment or to open new plants. Thus, although the sanction may burden some Virginia citizens, it does not burden Virginia as a governmental unit. For this reason, the sanction does not violate the principles of federalism embodied in the Tenth Amendment. New York, 112 S. Ct. at 2427 (upholding a sanction because "any burden caused by a state's refusal to regulate will fall on" private citizens); Hodel, 452 U.S. at 288 (harm to citizens of states does not create Tenth Amendment violation, absent direct harm to state governmental entities). The offset sanction is constitutional.

D.

The final sanction, federal permit program implementation, CAA § 502(d)(3), 42 U.S.C. § 7661a(d)(3), also is constitutional. The essence of a Tenth Amendment violation is that the state is commanded to regulate. Here, Virginia is not commanded to regulate; the Commonwealth may choose to do nothing and let the federal government promulgate and enforce its own permit program within Virginia. Because "the full regulatory burden will be borne by the Federal Government," the sanction is constitutional. Hodel, 452 U.S. at 288.

22

Hodel, in fact, is the mirror image of this case and controls our decision. In Hodel the federal government first implemented an environmental regulatory regime within each state but then gave each state the ability to end the federal program by implementing its own state environmental regulations that met certain criteria. In the present situation, the federal government gives the states the chance to enact their own regulations before the federal plan is imposed. For purposes of constitutional analysis, we cannot see how it makes a difference whether the federal plan is imposed first, or whether the states are given the chance to avoid imposition of the federal plan first. If anything, the CAA's method -- to give the states a chance first to avoid imposition of any federal plan by promulgating satisfactory regulations -- seems less coercive than the program upheld in Hodel. The CAA simply "establishes a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." Id. at 289.

Because Congress may choose to preempt state law completely, it may also take the less drastic step of allowing the states the ability to avoid preemption by adopting and implementing their own plans that sufficiently address congressional concerns. Id. at 290; Mack, 66 F.3d at 1029 ("The federal government may offer to preempt regulation in a given area and permit the states to avoid preemption if they regulate in a manner acceptable to Congress.").

In Maryland v. EPA, 530 F.2d 215 (4th Cir. 1975), vacated and remanded for consideration of mootness sub nom. EPA v. Brown, 431 U.S. 99 (1977) (per curiam), this court examined regulations promulgated under the CAA that on their face would have directly required Maryland to enact statutes and to administer an EPA plan. See also District of Columbia v. Train, 521 F.2d 971, 983 (D.C. Cir. 1975), vacated and remanded for consideration of mootness sub nom. EPA v. Brown, 431 U.S. 99 (1977) (per curiam).

The regulations in Maryland provided that "the state of Maryland shall" establish and implement certain pollution control programs. 530 F.2d at 219. EPA argued that the regulations' use of the word, "shall," meant that if Maryland did not comply, EPA could seek to impose civil and criminal penalties on the state for noncompliance. Id.

23

at 224. We rejected that proposed interpretation as "astonishing," id., and said it "would reduce the states to the puppets of a ventriloquist Congress." Id. at 226 (quoting Brown v. EPA, 521 F.2d 827, 839 (9th Cir. 1975), vacated and remanded for consideration of mootness, 431 U.S. 99 (1977) (per curiam)). Had we accepted EPA's proposed interpretation, Maryland's legislature would have been directly compelled to regulate, a result that would have offended the Tenth Amendment. Maryland, 530 F.2d at 224. Instead, we interpreted the regulations as authorizing EPA to implement a federal pollution control program directly. Id. at 227-28. This interpretation of the regulations did not offend the Tenth Amendment, even though Maryland was put under some pressure to pass laws satisfying federal criteria in order to avoid federal implementation. "Congress may induce a state to act by offering favors or exacting financial penalties." Id. at 226. See also Train, 521 F.2d at 984-85 (this procedure is "quite unremarkable"). In Maryland we sent Congress and EPA a signal that they could constitutionally use sanctions such as those at issue here.

Finally, the CAA's sanctions provisions maintain unity between regulation and political accountability. If sanctions are imposed, it will be "the Federal Government that makes the decision in full view of the public, and it will be federal officials that suffer the consequences if the decision turns out to be detrimental or unpopular." New York, 112 S. Ct. at 2424. The sanctions provisions are constitutional.

V.

In sum, we conclude (1) that EPA correctly disapproved Virginia's proposed state permit program because it did not satisfy the provisions of the Clean Air Act and (2) that the sanctions Virginia faces are constitutional. The petition for review is denied.

DENIED

24